**UNITED STATES of America,**
**Plaintiff,**

v.

**Ferdinand W. ROEBLING, III, Defendant.**

**Civ. A. No. 848-62.**

United States District Court
D. New Jersey.

June 29, 1965.

David M. Satz, Jr., U. S. Atty., by Lee B. Laskin, Asst. U. S. Atty., for plaintiff.

Backes & Backes, by Robert M. Backes, Trenton, N. J., for defendant.

MADDEN, Chief Judge:

This is an action for specific performance of a contract for the sale of real estate wherein the United States of America as vendor seeks to compel the defendant Ferdinand W. Roebling, III as vendee to perform his contract to purchase certain lands situate in the Borough of Mantoloking, Ocean County, New Jersey.

Litigation was instituted by the plaintiff when the defendant refused to accept the plaintiff's proffer of conveyance on the ground that the plaintiff's title was unmarketable. Albeit the defendant strenuously resists the primary relief sought by the plaintiff and counterclaims for rescision of the contract together with the return of his deposit with interest, the defendant is ready, able and willing to consummate the contract in the event this Court determines that the plaintiff's title is marketable.

An agreed stipulation of facts has been filed in this matter and the case is submitted to the Court for decision upon the pleadings, exhibits and respective briefs of counsel. Essentially, the facts are as follows:

On or about May 13, 1879, pursuant to a statute enacted by Congress on March 3, 1875, 18 Stat. 371, authorizing the Secretary of the Treasury of the United States to acquire the right to use and occupy sites for life-saving or life-boat stations, houses of refuge, and sites for pier-head beacons, the plaintiff obtained a deed to the property in question from the owner, Deborah Herbert, and her husband, Jacob B. Herbert. For a number of succeeding years, the property was used and occupied by the plaintiff as a site for a life-saving or life-boat station, the Mantoloking Coast Guard Station having been established thereon. On or before July 27, 1956, acting through the General Services Administration, the plaintiff advertised said property for a sealed bid sale pursuant to the provisions of the Federal Property Administrative Services Act of 1949 (40 U.S.C. § 484) and issued invitations for bids for the purchase of all the plaintiff's right, title and interest in the property.[1]

---

1. The terms and conditions of the sale were promulgated in the invitation and bid forms designated as Disposal No.: 2PS–198 and entitled, "Invitation, Bid and Acceptance For Sale Of Surplus Real Property Facilities (Including Instructions, Terms and Conditions and Forms for Bidding)," which, inter alia, provides:

"A. INSTRUCTION TO BIDDERS
"1. Bids may be for the *purchase* only of this property. All bids submitted shall be deemed to have been made with full knowledge of all terms, conditions and requirements herein contained.
"2. * * *
"3. * * *
"4. Each Bid must be accompanied by a certified check, cashier's check or

On August 27, 1956, in response to the invitation to bid and in accordance with the terms and conditions thereof, the defendant submitted a bid in the amount of $21,600.00 and tendered the sum of $2,160.00 as his deposit for the purchase

postal money order, payable to the order of 'General Services Administration' in the amount of 10% of bid, which sum may, at the option of the Government, be retained as liquidated damages in the event award is made by the Government to bidder and bidder fails to consummate within sixty (60) days of notification of award.

"5. * * *

"6. * * *

"7. * * *

"8. * * *

"9. * * *

"10. * * *

"B. GENERAL TERMS AND CONDITIONS

"1. * * *

"2. The description and location of the premises, facilities and property named in the foregoing Invitation are believed to be sufficiently specific for purposes of identification. Any error or omission in such description shall not constitute any ground or reason for non-performance of the contract or claim by the successful bidder for any allowance, refund, or deduction from the amount offered. A complete description of the property with all exceptions, reservations, and restrictions is available at the General Services Administration office where this bid is to be submitted, and all bids submitted will be on the basis of such complete description. The Government does not make any guaranty or warranty, express or implied, as to the quantity, quality, character or condition, size or kind thereof; or that same are in condition or fit to be used for the purpose for which intended.

"3. * * *

"4. * * *

"5. The foregoing Invitation, with all instructions, terms and conditions set forth herein, and the Bid, when accepted by the Government, shall constitute an agreement for sale between the successful bidder and the Government. Such agreement shall constitute the whole contract, to be succeeded only by the formal instruments of transfer, unless modified in writing and signed by both parties. No oral statement or representations made by, for, or ostensibly on behalf of either party shall be a part of such contract. Nor shall this contract or any interest therein, be transferred or assigned by the successful bidder without the consent of the Govern-

ment, and any assignment or transfer without such consent shall be void.

"6. * * *

"7. Upon acceptance of a bid, the Government shall apply the successful bidder's deposit toward payment of the purchase price.

"8. In event of revocation of an offer after the opening of bids, but prior to acceptance, the bidder's deposit shall become the property of the United States. In the event of default after notice of acceptance, but prior to the execution and delivery of the formal instruments of transfer, the deposit, together with all payments subsequently made on account, shall become the property of the United States.

"9. * * *

"10. * * *

"11. * * *

"C. ADDITIONAL TERMS AND CONDITIONS

"1. If a bid for the purchase of the real property and facilities is accepted, conveyance of the Government's interest therein will be made by deed without representation or warranty, express or implied.

"2. In the event a bid for the purchase of the real property for cash is accepted, concurrently with the conveyance thereof to the successful bidder, the latter shall pay the total purchase price, less credit in the amount of the deposit made at the time of submission of his bid * * *.

"3. Any title evidence, including abstracts and continuations thereof, title certificates, or policies of title insurance, which may be desired by the successful bidder shall be procured by him at his sole cost and expense. The Government will, however, cooperate with the successful bidder or his authorized agent in this connection, by permitting examination and inspection of such deeds, abstracts, tax receipts, affidavits of title, judgment in condemnation proceedings, or other documents relating to the title of the premises and property involved, as it may have available.

"4. In the event the successful bidder submits proof of evidence of any encumbrance, objection or defect affecting the title to the property, other than those provided for herein, the Government shall be accorded a reasonable time within which to dispose of such objection or defect. In the event, the Govern-

of said property. Shortly thereafter, on or about August 30, 1956, the defendant's bid was accepted by the General Services Administration on behalf of the plaintiff and the defendant was so notified.

Subsequently, on or about September 1, 1956, the defendant was informed by another bidder, William R. Wesson, that the plaintiff did not own the fee to the property in question, that the title to the property was encumbered by a possible reversionary interest, and that his father's estate was the owner of a one-third reversionary interest. As a result of receiving this information, the defendant ordered an immediate title examination from the New Jersey Realty Title Insurance Company. The Report of Title substantially confirmed the information disclosed to the defendant and a copy of the Report was forwarded to the Assistant Regional Counsel of the General Services Administration.[2] At the same time, the attention of Assistant Regional Counsel was directed to a letter of K. S. Harrison, Chief Counsel of the United States Coast Guard, dated October 1, 1947, which was uncovered at the time of the title examination. This letter indicated that the plaintiff had not acquired a marketable title to the property and that the usual procedure for disposition of such property when no longer needed for Coast Guard purposes was by

formal declaration of abandonment of all right, title and interest acquired by the United States in its deed.

On October 17, 1956, in reply to the notification of the alleged defect in the plaintiff's title, Assistant Regional Counsel rejected the objection made to the plaintiff's title in the Report of Title and advised the defendant that the form of the deed used in acquiring the property in 1879 was sufficient to convey to the plaintiff a fee simple title. Then, by letter dated February 13, 1957, the defendant was notified of a date for settlement and advised that in the event the defendant failed to appear and close title, the plaintiff would take appropriate legal action. On February 19, 1957, the defendant notified Assistant Regional Counsel that he would not accept a deed to the property nor pay the balance of the consideration because the title was unmarketable, having reverted to the heirs of the plaintiff's grantor, Deborah Herbert, upon the abandoned use of the property as a Coast Guard site. In the same letter the plaintiff was notified that the defendant rescinded his bid and demanded the return of his deposit retained by the plaintiff unless the claims of the reversionary heirs were eliminated. Thereafter, no action was taken by either party until the institution of this litigation by the plaintiff.

---

ment shall be unable to dispose of any such encumbrance, objection or defect and the same renders title unmarketable, then the successful bidder may rescind the contract and recover all moneys paid on account of the purchase price, provided however, that neither the successful bidder nor any person claiming under him shall be entitled under any circumstances to recover from the Government any damages, interest or costs on account of any encumbrance, objection or defect affecting the title to the property.

"5. * * *
"6. * * *
"7. * * *"

2. The Report of Title, relevant to the issue sub judice, reads as follows:
"8. Deed by which the United States of America acquired title to premises in

question appears to be limited to the use for a 'Life Saving Station'. Upon the cessation of said use, which would occur upon the contemplated conveyance, it would seem that the residuary title would vest in Deborah Herbert, her heirs, devisees or assigns. Until such instrument under which United States of America acquired title is declared by a court of competent jurisdiction to have conveyed a fee simple title, this company will not undertake to insure good, marketable title in the proposed purchaser in the absence of obtaining deeds from aforesaid heirs, devisees or assigns of the original grantor.
"9. Until the proposed procedure is determined we have not searched the various heirs, devisees or assigns of Deborah Herbert and this report is subject to any disclosures resulting therefrom."

It should be noted at this juncture that neither party to this action contests the existence of the contract of sale which was created on August 30, 1956,[3] nor is it disputed that under the terms of the contract, it is incumbent upon the plaintiff to deliver a good or marketable title to the defendant.[4] The fundamental issue to be determined by the Court is whether the plaintiff's title is marketable, or, in other words, whether the character of the plaintiff's title is such that the Court will compel the defendant to accept a conveyance of the property in question.

 An examination of local authority with reference to applicable law induces the Court to concur in the observation made by Judge Price in Gaub v. Nassau Homes, Inc., 53 N.J.Super. 209, at page 217, 147 A.2d 73, at page 78 (A.D., 1958):

"The courts have employed various expressions to indicate the standard which should be applied in determining whether in a particular action for specific performance a defendant's challenge of a plaintiff's title is sufficiently serious and basic to enable such defendant to resist successfully an action to compel him to accept the conveyance."

To attempt to indulge in an exhaustive review of such authority in this opinion would be superfluous expatiation, for in the opinion in the Gaub case, Judge Price carefully reviewed the leading local cases on point and concluded:

"Although, as has been seen, the courts have used various expressions to state their conclusions, they all result in the enunciation of substantially the same basic principles. *They hold that a defendant will not be compelled to take a conveyance if it be reasonably probable that he will be exposed to litigation thereafter, or if it seems reasonable to believe that subsequently he will be obliged to institute an affirmative action to quiet the title or otherwise.* Not every possible litigation to which such a defendant might be subjected is deemed a 'hazard' sufficient to deny a plaintiff the relief he seeks. Such prospective action must have some substance. A challenge by a prospective grantee based on 'remote, hypothetical or unfounded doubts concerning the title' is not such a claim against marketability as can be recognized. \* \* \*" (p. 223, 147 A.2d p. 81.) (Emphasis supplied.)

Suffice it to state that the courts have declined to grant specific performance in such instances where the defendant's objection to the plaintiff's title presents: a question of marketability reasonably debatable in court, in point of law or equity; a question too doubtful to be settled without litigation; a question not settled by previous authorities; or a question on which another judge might come to a different conclusion as might be indicated by reported decisions.[5]

The crux of the defendant's objection to the plaintiff's title is that under the deed of 1879 the plaintiff acquired from its grantor a title of lesser dignity than a fee simple; to wit, a qualified or limited estate, which reverted to the heirs of the plaintiff's grantor upon the abandon-

3. See footnote 1: "B. GENERAL TERMS AND CONDITIONS," paragraph 5.

4. See Footnote 1: "C. ADDITIONAL TERMS AND CONDITIONS," paragraph 4; cf. La Salle v. La Pointe, 14 N.J. 476, 102 A.2d 761 (1954).

5. Gaub v. Nassau Homes, Inc., 53 N.J. Super. 209, 147 A.2d 73 (A.D., 1958); Mazzola v. Malley, 5 N.J.Super. 562, 68 A.2d 655 (Ch.Div., 1949); Hoffman v. Perkins, 3 N.J.Super. 474, 67 A.2d 210 (Ch.Div., 1949); Breitman v. Jaehnal, 99 N.J.Eq. 243, 132 A. 291 (Ch., 1926); Burke v. Dorfan, 101 N.J.Eq. 84, 137 A. 844 (Ch., 1927); Pound v. Pleister, 106 N.J.Eq. 101, 150 A. 58 (Ch., 1930), aff. 107 N.J.Eq. 577, 153 A. 907; Schweitzer v. Adami, 113 N.J.Eq. 46, 166 A. 124 (E.A., 1933); Dobbs v. Norcross, 24 N.J.Eq. 327 (Ch., 1874); Schoenkerg v. O'Connor, 14 N.J.Misc. 412, 185 A. 377 (Sup.Ct., 1935), aff. 116 N.J.L. 398, 185 A. 382.

ed use of the property as a Coast Guard site. The defendant argues that under the circumstances of this case if he were to accept a conveyance of the plaintiff's interest to the property in question, voluntarily or through a court order, it is either reasonably probable that he would be exposed to litigation thereafter, or, reasonable to believe that subsequently he would be obliged to institute an affirmative action to quiet title or otherwise. On the other hand, the plaintiff contends that under the deed of 1879 acquired from its grantor, the plaintiff possesses a marketable fee simple title which the defendant should be compelled to accept and pay the balance of consideration therefor in accordance with the contract of sale.

Basic to the issue at hand is the construction to be placed upon the instrument by virtue of which the plaintiff asserts title; and while it is not necessary for the Court to ascertain by judicial construction the extent and nature of the estate created and conveyed to the plaintiff by that instrument, the Court must examine the instrument to determine whether there exists a substantial question concerning the construction which might be doubtful or reasonably debatable.

The conveyance of 1897 from Deborah Herbert and her husband, Jacob B. Herbert, to the plaintiff was accomplished by means of an "indenture" which provides:

"WHEREAS, the SECRETARY OF THE TREASURY has been authorized by law to establish the LIFE-SAVING STATION herein described:

"AND WHEREAS, Congress, by Act of March 3, 1875, provided as follows, viz: 'And the Secretary of the Treasury is hereby authorized, whenever he shall deem it advisable, to acquire, by donation or purchase, in behalf of the United States, the right to use and occupy sites for Life-saving or Life-boat Stations, Houses of Refuge, and sites for Pier-head Beacons, the establish-

ment of which has been, or shall hereafter be, authorized by Congress:'

"AND WHEREAS, the said Secretary of the Treasury deems it advisable to acquire, on behalf of the United States, the right to use and occupy the hereinafter-described lot of land as a site for a Life-saving Station, as indicated by his signature hereto:

"NOW, THIS INDENTURE, between Deborah Herbert and her husband Jacob B. of the township of Brick, County of Ocean and State of New Jersey, parties of the first part, and the United States, represented by John Sherman, Secretary of the Treasury, party of the second part, WITNESSETH, that the said party of the first part, in consideration of the sum of One Hundred Dollars by these presents grant, demise, release, and convey unto the said United States all that certain lot of land situate (herein is described the lands in question) be the contents what they may, with full right of egress and ingress thereto in any direction over other lands of the grantors by those in the employ of the United States, on foot or with vehicles of any kind, with boats or any articles used for the purpose of carrying out the intentions of Congress in providing for the establishment of Life-saving Stations, and the right to pass over any lands of the grantors in any manner in the prosecution of said purpose; and also the right to erect such structures upon the said land as the United States may see fit, and to remove any and all such structures and appliances at any time; the said premises to be used and occupied for the purposes named in said Act of March 3, 1875:

"TO HAVE AND TO HOLD the said land and privileges unto the United States from this date.

"AND IT IS FURTHER STIPULATED, that the United States

shall be allowed to remove all buildings and appurtenances from the said land whenever it shall think proper, and shall have the right of using other lands of the grantor for passage over the same in effecting such removal."

The plaintiff argues that the instrument under consideration should be construed in accordance with N.J.S.A. 46:3–13 which favors that construction of a deed creating a fee simple, and that since the instrument contains no words of exception, limitation, reversion or expressions of use, the Court should conclude that an estate in fee simple was created and conveyed to the plaintiff.

■ First, the Court is constrained to express its doubt as to the application of the statute in this instance. The instrument or deed of 1879 was prepared, executed and delivered by the parties thereto prior to the enactment of N.J.S.A. 46:3–13, so it is reasonable to assume that the statute was not contemplated by the parties at such time. Second, the statute, N.J.S.A. 46:3–13, in part, provides:

"Every deed conveying lands shall, *unless an exception be made therein*, be construed to include all the estate, right, title, interest, use, possession, property, claim and demand whatsoever, both in law and equity, of the grantor, including the fee simple if he had such an estate, of, in and to the premises conveyed, with the appurtenances, and the word 'heirs' shall not be necessary in any deed to effect the conveyance of the fee simple; * * *." (Emphasis supplied.)

It is apparent that the statute provides for an exception to the mandatory construction to be given to the interpretation of deeds under the statute. Thus, if an "exception" is made in the deed evincing the intent of the parties to limit or condition the estate conveyed, then the deed may be construed to create a lesser estate than that of a fee simple. Therefore, even assuming that the aforesaid statute is applicable in this instance, if the intention of the parties to condition or limit the estate is manifested in the instrument, then the mandatory provision of the statute need not be effected.

Third, while the plaintiff urges there are no words of exception, limitation, reversion or expressions of use in the deed, the Court feels there is a good question concerning the existence of intention to limit or condition the estate manifested in the instrument.

■ In construing a deed the Court must, if possible, give effect to all of its terms and provisions, Camden, Atlantic & Ventnor Land Co. v. West Jersey & S. R. Co., 92 N.J.L. 385, 105 A. 229 (E. & A., 1918), but the prime consideration is the intention of the parties. In the case of Oldfield v. Stoeco Homes, Inc., 26 N.J. 246, 139 A.2d 291 (1958) it was expressed thus:

"While language is the primary guide for the ascertainment of whether a given deed attempts to condition or limit an estate, still it is the instrument as a whole, and not a particular phrase aborted from the context which provides the basis for the attainment of our ultimate task which is to effectuate the intention of the parties." (pp. 255 and 256, 139 A.2d p. 296)

\* \* \* \* \* \*

"If the four corners of the deed provide a coherent expression of the parties' intent, we need search no further, but if an ambiguity or a reasonable doubt appears from a perusal of the particular symbols of expression our horizons must be broadened to encompass the circumstances surrounding the transaction." (p. 257, 139 A.2d p. 297)

In the case of Etheridge v. United States, 218 F.Supp. 809 (D.C., E.D.N.C., 1963), an instrument of conveyance similar to that in the instant case was construed by District Judge Larkins to be a grant of a fee simple determinable so that when the United States ceased using the land for a life-saving station the land automatically reverted to the grant-

ors by operation of law. The action in that case was based on an implied contract to recover from the United States the reasonable rental value of the land, and the issue before the Court rested upon the kind of estate conveyed by the deed from the plaintiffs to the United States. With possibly two exceptions, what was stated by Judge Larkins in the Etheridge case is apposite to the instant matter.[6] The first possible exception is with reference to the covenant to war-

---

6. "The Court must determine initially whether the deed in question conveyed a fee simple absolute or something less. As has been noted, the language of the deed must clearly manifest the intention of the parties to convey otherwise. In this instant case, the language employed in the deed is sufficiently clear to show that the parties intended a conveyance of an estate of less dignity than a fee simple absolute.

"While the statute (pursuant to which the Secretary of the Treasury was authorized to acquire property) may have permitted the Secretary to acquire property in fee simple, it is evident by the wording throughout the conveyance that neither party intended an acquisition of the fee. Paragraph Three of the deed reads, in part, as follows: '* * * the said Secretary * * * deems it advisable to acquire * * * the right to use and occupy the hereinafter described lot of land as a site for a Life Saving Station * * *.' This language, coupled with the statute, as set out in the Second Paragraph, indicates that the land was being acquired for one purpose only, that is, for the use and occupation as a site for a lifesaving station. Such language places a limitation upon the fee conveyed.

"In the Fourth Paragraph, a nominal consideration of One Hundred Dollars ($100.00) for the ten acres of seashore property is listed. This is taken into consideration in ascertaining the intention of the parties.

"Paragraph Five of the deed grants the defendant full right of egress and ingress over the lands of the grantors, plus the right to erect structures thereon and remove them from these lands. But these rights are granted only when the defendant is in the process of establishing a lifesaving station on the conveyed property. This is clearly expressed. Obviously, when and if the defendant used the conveyed land for any purpose other than that named, it would lose its right to use the other lands of the grantors. In connection with granting these rights, the grantors stated that, '* * * the said premises to be used and occupied for the purpose named in said Act of March 3, 1875.' This wording manifests a clear intent by the grantors to limit the estate conveyed by restricting the use of the property for the sole purpose of lifesaving.

"The Seventh Paragraph provides that the grantors, '* * * do covenant with the United States to warrant and defend the peaceable possession of the above described premises * * * for the purpose above named for the term of this conveyance against the lawful claims of all persons * * *.' In a case where a fee simple title was conveyed, the covenants to warrant and defend possession of the land would not be limited to a specified purpose. Then too, the language reads, "* * * for the purpose above named for the term of this conveyance * * *.' This wording clearly limits the effect of the conveyance. The word 'term' is defined as 'a determined or prescribed duration.' Carpenter v. Okanogan County, 163 Wash. 18, 299 P. 400. Black's Law Dictionary defines it as a "* * * limitation, or extent of time for which an estate is granted * * *.' Thus, the parties clearly intended to limit the estate conveyed and the basis of the limitation is the use and occupancy of the land as a lifesaving station. 'No clause, if reasonable intendment can be found, shall be construed as meaningless.' Lackey v. The Hamlet City Board of Education, et al., [258 N.C. 460, 128 S.E.2d 806] supra.

"In Paragraph Eight, the parties stipulated that the defendant be allowed to remove from the conveyed land all structures whenever it thought proper. Such a stipulation would never have been made or inserted in the conveyance had the parties intended a conveyance in fee simple. A good title in fee simple is indefeasible, marketable and unencumbered. See Lea v. Bridgeman, 228 N.C. 565, 46 S.E.2d 555 (1948). By definition a fee simple title cannot be qualified or limited, but carries with it full legal rights with respect to the property.

"It should be noted in Paragraph Nine that the grantor waived all his claims to rents from defendant for the use of his other lands because of the conveyance for lifesaving purposes.

"All of these references throughout the deed to the purpose for which the land was to be used are more than a simple

rant and defend the peaceable possession of the property (the seventh paragraph of the deed in the Etheridge case) which does not appear to be contained in the deed in the instant matter. The second possible exception is the grantors' waiver of claims to rents (the ninth paragraph of the deed in the Etheridge case) which does not appear in the instant deed. However, neither possible exception would seem to be of such significance as to render the case so distinguishable that its relevance to the instant matter would be completely lost. Admittedly, the two variations do tend to give additional support to the conclusion reached by Judge Larkins in the Etheridge case, but their absence would not seem to detract from the validity of his conclusion in holding the deed conveyed an estate of less dignity than a fee simple. So, at the very least, the Etheridge case appears to make the question concerning the construction of the deed substantial, reasonably debatable, and, perhaps, too doubtful to be settled without litigation.

In addition to the observations made in the Etheridge case which this Court feels are generally applicable to the instant case, the Court further observes that the instrument under consideration, in the third paragraph, employs the language, "AND WHEREAS, the said Secretary of the Treasury deems it advisable to acquire * * * *the right to use and occupy* * * *.*" This Court feels that such language would not have been employed in the deed if the intention of the parties were to create a fee simple estate; for assuming the authorizing statute of 1875 permits the acquisition of land in fee simple, the language normally employed would not have been so limited or restricted.

■ In the opinion of the Court a substantial question concerning the plaintiff's title definitely exists. The legal question as to the construction to be placed on the instrument of 1879 by virtue of which the plaintiff acquired title appears, at the very least, to be reasonably debatable. It was raised by a reputable title company, engaged by the defendant, in its report of title and the title company refused to insure a good, marketable title in the absence of either, a determination by a court of competent jurisdiction that the plaintiff's title was one in fee simple, or, deeds from the heirs of the plaintiff's grantor. It was passed upon by the Chief Counsel of the United States Coast Guard in a letter under date of 1947 which indicated the plaintiff had not acquired a marketable title to the property in question. And it was originally brought to the attention of the defendant by one of the heirs of the plaintiff's grantor who claims that his father's estate is the owner of a one-third reversionary interest in the property.

While the question of marketability is a question to be determined by a court of competent jurisdiction and not one to be determined by a title company, legal counsel or an individual, nevertheless, the raising of the question indicates a doubtful status as to title. Furthermore, it bears upon the question of the reasonable probability in exposing the defendant to subsequent litigation if he were to accept the plaintiff's conveyance.

The question concerning the plaintiff's title is sufficiently serious and basic for it affects the ownership of the property in question and goes to the basic instrument by virtue of which the plaintiff asserts title. It presents a reasonable probability of exposing the defendant to subsequent litigation with a substantial basis, either as a defendant to protect his title or as a plaintiff to quiet title, and it

---

expression of the grantors' motive which induced them to execute the deed. The purpose is consistently set out in the conveyance so as to manifest the intention of both parties to limit the use of the land to the specified purpose only. Having considered the whole instrument and giving reasonable intendment to every clause where possible, this Court finds that there is a clear intention of the parties to restrict the fee and to limit the use of the property as a lifesaving station." Etheridge v. United States, supra, pp. 811, 812 and 813.

engenders a doubt that is reasonable and not "remote, hypothetical or unfounded."

██ It is clear that if the plaintiff's title is reasonably doubtful this Court may decline to grant specific performance without the necessity of pronouncing the title bad or attempting to determine the precise nature or extent of the title held by the plaintiff under the instrument of 1879. See Dobbs v. Norcross, 24 N.J.Eq. 327, and Tillotson v. Gesner, 33 N.J.Eq. 313, at page 326, wherein it was stated:

"The true rule is stated in 3 Pars. on Con. (6th ed.) *380, that if the character of the title be doubtful, although the court were able to come to the conclusion that, on the whole, a title could be made that would not probably be overthrown, this would not.be good title enough; for the court have no right to say that their conclusion, or their opinion, would bind the whole world, and prevent an assault on the title. The purchaser should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value. The court cannot satisfactorily or conclusively settle a title in the absence of parties who are not before them in the suit to assert their estate or interest in the lands."

Although it is not incumbent upon the Court to proceed further on this question of construction of the deed for a determination of the issue at hand, the Court is constrained to state that if all of the parties in interest were before the Court so that the issue of the construction might be settled, the Court would be inclined to hold that the plaintiff did not acquire a title in fee simple absolute and that the property did revert to the heirs of the plaintiff's grantor upon the abandoned use of the property as a life-saving station.[7]

In light of the foregoing, the Court concludes that the defendant cannot be compelled to specifically perform the contract of sale, so that the relief requested by the plaintiff is hereby denied. And inasmuch as this Court has determined that the title of the plaintiff is not marketable, then the Court must order the return of the defendant's deposit of $2,160.00 without interest or costs in accordance with the contract of sale, and permit the defendant to rescind his contract.[8]

Counsel will prepare an appropriate order in conformity with this opinion.

---

7. In the course of the pretrial of this matter, the Court suggested that all parties in interest, including the heirs of the plaintiff's grantor, be made parties to the action in order to resolve and settle the issue of title by a bill to quiet title. This counsel for the government refused to do and wanted the issue disposed of according to the pleadings then before the Court.

8. See Footnote 1: "C. ADDITIONAL TERMS AND CONDITIONS" paragraph 4.